**ALLEGHENY GENERAL HOSPITAL,**
et al., Plaintiffs,

v.

**PHILIP MORRIS, INC.,**
et al., Defendants.

No. Civ.A. 99–9.

United States District Court,
W.D. Pennsylvania.

Nov. 4, 1999.

M. Theresa Creagh, Terrence J. O'Rourke, Melissa L. Staggers, Nash & Company, Pittsburgh, PA, for plaintiffs.

Robert S. Grigsby, Kevin C. Harkins, Cohen & Grigsby, Pittsburgh, PA, Mary A. McLaughlin, David M. Howard, Kathy E. Ochroch, Dechert, Price & Rhoads, Philadelphia, PA, for defendants.

Mary E. McGarry, Adam I. Stein, Michael P. Panagrossi, Simpson, Thacher & Bartlett, New York City, for Philip Morris, B.A.T. Industries, defendants.

J. Kurt Straub, Obermayer, Rebmann, Maxwell & Hippel, Philadelphia, PA, Marvin S. Lieber, Obermayer, Rebmann, Maxwell & Hippel, Pittsburgh, PA, for Liggett Group, Inc., defendant.

John K. Gisleson, Schnader, Harrison, Segal & Lewis, Pittsburgh, PA, for Smokeless Tobacco Council, Inc., defendant.

Marcus & Shapira, Scott D. Livingston, Pittsburgh PA, for R.J. Reynolds, defendant.

## OPINION and ORDER OF COURT

AMBROSE, District Judge.

Pending before the Court are Motions of Philip Morris Incorporated, R.J. Reynolds Tobacco Company, Brown & Williamson Tobacco Corporation (individually and as successor by merger to The American Tobacco Company), Lorillard Tobacco Company, United States Tobacco Company, The Tobacco Institute, incorporated, The Council for Tobacco Research–USA, Incorporated, Hill & Knowlton, Inc. and the Liggett Group, Inc. ("Defendants") to Dismiss the First Amended Complaint filed against them by Plaintiffs who own and operate hospitals and health care facilities and have provided and continue to provide medical services to Medicaid, medically indigent and non-paying patients who suffered from tobacco-related illnesses. The Plaintiffs' First Amended Complaint alleges federal claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962, and the federal antitrust laws, 15 U.S.C. § 1 *et seq.*, as well as various state law claims, and seeks monetary damages from Defendants. Because I have found that all of the Plaintiffs' claims against the Defendants must fail for

failure to state a claim upon which relief can be granted, the Defendants' Motions to Dismiss are granted.

## STANDARD OF REVIEW

In deciding a motion to dismiss, all factual allegations and all reasonable inferences therefrom must be accepted as true and viewed in the light most favorable to the plaintiff. *Colburn v. Upper Darby Tp.,* 838 F.2d 663, 666 (3d Cir.1988), *cert. den'd,* 489 U.S. 1065, 109 S.Ct. 1338, 103 L.Ed.2d 808 (1989). A court may dismiss a plaintiff's complaint only if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claims which would entitle him to relief. *Conley v. Gibson,* 355 U.S. 41, 45, 78 S.Ct. .99, 2 L.Ed.2d 80 (1957). In ruling on a motion to dismiss for failure to state a claim, the court looks to "whether sufficient facts are pleaded to determine that the complaint is not frivolous, and to provide defendants with adequate notice to frame an answer." *Colburn,* 838 F.2d at 666.

## LEGAL ANALYSIS

Although contained in a 103 page, 387 paragraph, fifteen (15) count First Amended Complaint, in a nutshell, the Plaintiffs' claims against the Defendants are premised upon allegations that the Defendants conspired to conceal from and/or misrepresent to the Plaintiffs information in their possession about the health hazards of cigarette smoking and other tobacco products and also intentionally conspired not to compete in the development of a "safer" cigarette or other nicotine delivery products, all in order to cause the Plaintiffs not to reduce tobacco consumption in the Medicaid, medically indigent and non-paying patients that they treated for tobacco-related illnesses and to continue paying the costs of health care to these patients. Plaintiffs contend that as a result of the above-described conduct by the Defendants, the Plaintiffs suffered injuries in the form of incurring significant financial costs and expenses attributable to tobacco-related diseases, being unable to participate in a health care market where there would have been alternative safer or less addictive cigarettes that would have reduced their costs and expenses related to tobacco-related diseases or where they could have advised, suggested, subsidized or required their patients to use effective alternative products such as safer cigarettes or less addictive cigarettes or other nicotine products.

### A. *Proximate Causation/Standing.*

Defendants first attack all of the Plaintiffs' claims against them on the basis that the Plaintiffs suffered no direct injury, but merely incurred the costs of injuries allegedly suffered directly by smokers who sought medical treatment from them and therefore, their injuries are too remote as a matter of law for them to have standing to sue the Defendants.[1] Memorandum in

---

1. More particularly, Defendants argue:
 [t]he Hospitals did not purchase or smoke cigarettes or suffer direct injury as a result of the defendants' alleged misconduct. Rather, the Hospitals allege that certain Medicaid and other indigent patients suffered "smoking-related" injuries from using defendants' products and that the Hospitals were indirectly injured when they provided medical services for those patients. The Complaint must be dismissed because as this Court explained less than four months ago, the law has been clear for more than 150 years that "[a] plaintiff who complaint[s] of harm flowing merely from the misfortunes visiting upon a third person by the defendant's acts was generally said to stand at too remote a distance to recover." *Williams & Drake,* slip op. at 5–6 (quoting

*Holmes v. Sec. Investor Protection Corp.,* 503 U.S. 258, 268–69, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992)).
 The Hospitals attempt to conjure up a direct injury by alleging that defendants' alleged misrepresentations misled the Hospitals, as well as the smokers, and that as a result the Hospitals "did not take, or would have taken sooner, actions to minimize the losses resulting from tobacco-related injuries and diseases and to discourage and reduce cigarette ... use and costs associated therewith." Amended Compl. ¶ 300; *see also* Amended Compl. ¶¶ 64, 66, 304, 311. But no matter how the Hospitals plead their claim, their alleged *injury* remains derivative because the Hospitals did not suffer any loss unless and until the smokers suffered an injury that required treatment.

Support of Certain Defendants' Motion to Dismiss the Amended Complaint For Failure to State A Claim ("Defendants' Supporting Brief"), pp. 4–5. Plaintiffs raise a number of arguments in response to Defendants' argument that all their claims must be dismissed because it is too remote from the alleged wrongdoing of the Defendants. Memorandum in Support of the Hospital Plaintiffs' Opposition to Certain Defendants' Motion to Dismiss the Amended Complaint for Failure to State a Claim ("Plaintiffs' Opposition Brief"), pp. 1, 3–6, 9.

Although Defendants do not utilize the terms, this argument in essence is that the Plaintiffs' claims against them must be dismissed for lack of proximate causation/lack of standing. In examining the issue of whether Defendants' alleged misconduct was the proximate cause of the Plaintiffs' injuries and therefore, the Plaintiffs have standing to bring suit or whether the alleged injuries are too remote from the alleged conduct and therefore, the Plaintiffs lack standing to bring suit, the applicable analysis is set forth by the United States Court of Appeals for the Third Circuit in *Steamfitters, supra.* In *Steamfitters*, the appellate court was reviewing the district court's dismissal of claims by

union health and welfare funds against tobacco companies and tobacco industry organizations under antitrust law, the RICO statute and state common law to recover for the funds' costs of treating their participants' smoking-related illnesses.[2] The *Steamfitters* decision will be discussed *infra.* in great detail with respect to many of the Plaintiffs' claims against the Defendants.

1. *Plaintiffs' Antitrust Violation Claims (Counts IV and V).*

■ Relevant to the Plaintiffs' antitrust violation claims against the Defendants, Plaintiffs allege:

Defendants have conspired: (1) to suppress innovation and competition in product quality by agreeing not to engage in research, development, manufacture and marketing of less harmful cigarettes and other nicotine products; (2) to suppress output in the market, and to engage in concerted refusal to deal, by agreeing to keep at zero the output of less harmful cigarettes and other nicotine products; and (3) to suppress competition in marketing by agreeing not to take business from one another by making claims as to the relative safety of

---

Defendants' Supporting Brief, p. 4, *citing, Williams & Drake Co., Inc. v. American Tobacco Co.*, No. 98–553, slip op. (W.D.Pa. Dec. 21 1998) (J. Ambrose); *Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.*, 171 F.3d 912 (3d Cir.1999) ("*Steamfitters II* "); *Laborers Local 17 Health and Benefit Fund v. Philip Morris, Inc.*, 172 F.3d 223 (2d Cir.1999), withdrawn at request of court, superseding opinion, 191 F.3d 229 (2d Cir.1999) ("*Laborers Local II* "); *Regence Blueshield v. Philip Morris, Inc.*, 40 F.Supp.2d 1179 (W.D.Wash.1999). *See also id.* at p. 2, *citing, Laborers Local II, supra.* ("[t]he Amended Complaint should be dismissed in its entirety because the Hospitals are in precisely the same position as the employer in *Williams & Drake* and the union trust funds in *Steamfitters II and Laborers Local II* —they suffered no direct injury, but merely incurred the costs of injuries allegedly suffered directly by smokers who sought medical treatment. As the Second Circuit succinct-

ly concluded, because such 'economic injuries ... are purely derivative of the physical injuries suffered by [individual smokers],' the plaintiffs' alleged injuries are 'too remote as a matter of law for them to have standing to sue defendants'.").

2. The *Steamfitters* court summarized the allegations contained in the plaintiffs' complaint as follows:

[t]he plaintiff funds allege that they were defrauded by the defendants—tobacco companies and related industry organizations— into paying for their participants smoking-related illnesses, as well as prevented by these defendants from informing the funds' participants about safer smoking and smoking cessation products. The defendants allegedly conspired to prevent the funds from obtaining and using information that would have reduced the incidence of smoking— and therefore of illness—among the funds' participants.

*Steamfitters*, 171 F.3d at 917.

particular brands, whether or not such claims would have been truthful.

Plaintiffs' First Amended Complaint, ¶ 269. Plaintiffs also allege that they were consumers in the market for information related to the effects of tobacco use on health as well as for information related to alternative tobacco products which would reduce their expenditures for care provided to Medicaid, medically indigent and non-paying patients. *Id.* at ¶ 274. Plaintiffs further allege that the Defendants are in the business of selling nicotine, a drug, and that but for the conspiracy alleged, a new submarket for less harmful cigarettes or other nicotine products would have been available to consumers. Plaintiffs aver that they are purchasers of such drugs, products and services used in the treatment of nicotine addiction and dependence and are potential customers in the market for less harmful cigarettes or other nicotine products.

Concerning the proximate cause requirement for antitrust claims, the *Steamfitters* court first discussed the primary factors for evaluating proximate cause in an antitrust action as set forth by the United States Supreme Court in *Blue Shield of Virginia v. McCready,* 457 U.S. 465, 478, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982), which are as follows: "(1) 'the physical and economic nexus between the alleged [antitrust] violation and the harm to the plaintiff' and (2) 'more particularly, ... the relationship of the injury alleged with those forms of injury about which Congress was likely to have been concerned in making defendant's conduct unlawful and in providing a private remedy' under the antitrust laws." *Steamfitters,* 171 F.3d at 922. Notably, in making this inquiry, the *McCready* Court explained in relevant part: "[w]here the injury alleged is so integral an aspect of the conspiracy alleged, there can be no question but that the loss was precisely the type of loss that the claimed violations ... would be likely to cause." *McCready,* 457 U.S. at 479, 102 S.Ct. 2540.

Applying the *McCready* inquiry to the allegations relevant to the antitrust claims contained in Plaintiffs' First Amended Complaint, I find, as did the *Steamfitters* court, that here:

"the tobacco companies could have achieved their alleged aims without the existence of the [Plaintiffs] or the relationship between the [Plaintiffs] and smokers.... [T]he tobacco companies would have had ample reason to engage in a conspiracy to prevent safer tobacco products from coming on the market, regardless of the relationship between the [Hospital Plaintiffs] and smokers. The very existence of smokers would be a sufficient reason for such an alleged conspiracy. The fact that the [Hospital Plaintiffs provided unreimbursed medical services to Medicaid, medically indigent and non-paying patients] for their smoking-related illnesses might have made the conspiracy more profitable or allowed it to exist longer, but the relationship between the [Hospital Plaintiffs] and smokers was not a necessary step in effecting the ends of the alleged illegal conspiracy".

*Id.* at 923. Thus, under the *McCready* analysis, Plaintiffs have not alleged facts in their First Amended Complaint sufficient to establish the proximate cause requirement for their antitrust claims. The *Steamfitters* court then discussed the United States Supreme Court's decision in *Associated General Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983) ("*AGC*") wherein the Court outlined a number of factors to consider in analyzing whether a plaintiff has antitrust standing. These factors are:

(1) the causal connection between defendant's [antitrust] wrongdoing and plaintiff's harm; (2) the specific intent of defendant to harm plaintiff; (3) the nature of plaintiff's injury (and whether it relates to the purpose of the antitrust laws, i.e. ensuring competition within economic markets); (4) "the directness or indirectness of the asserted injury"; (5) whether the "damages claim is ...

highly speculative"; and (6) "keeping the scope of complex antitrust trials within judicially manageable limits," i.e., "avoiding either the risk of duplicate recoveries on the one hand, or the danger of complex apportionment of damages on the other."

*Steamfitters,* 171 F.3d at 924, *quoting, AGC,* 459 U.S. at 537–38, 103 S.Ct. 897.

Applying the *AGC* factors to the facts alleged in Plaintiffs' First Amended Complaint, I find first that Plaintiffs have alleged a causal connection between the Defendants' alleged conspiratorial conduct and the Plaintiffs' injuries in that their allegations are that but for the alleged conspiratorial misconduct, Plaintiffs could have assisted their patients to stop smoking and/or one or more of the Defendants would have developed a less harmful cigarette or other nicotine delivery system which their Medicaid, medically indigent and non-paying patients with tobacco-related illnesses would have used. Therefore, Plaintiffs argue, they would have been able to reduce their costs for caring for Medicaid, medically indigent and non-paying patients with tobacco-related diseases.

Second, I find that Plaintiffs have alleged that the Defendants' alleged conspiratorial conduct was specifically intended to harm the Plaintiffs in that Defendants allegedly acted as they did so that Plaintiffs, rather than Defendants, would incur the costs of treating Medicaid, medically indigent and non-paying patients with tobacco-related diseases.

Third, concerning the nature of the Plaintiffs' injuries and whether they relate to the purpose of the antitrust laws, i.e. ensuring competition within economic markets, it is helpful to examine the discussion of the *Steamfitters* court on this issue. Specifically, the *Steamfitters* court first discussed the plaintiff funds' claims based upon indirect cost increases from smoking-related illnesses and concluded that because "[t]he Funds are not consumers forced to pay higher prices for tobacco products or competitors harmed by defen-

dants' ability to conceal the unsafe nature of their products," but rather, were "simply some of the many groups or individuals suffering the financial or medical repercussions of the decades-long marketing of a product we now know is demonstrably unsafe," this injury by the Fund did not relate to the purpose of the antitrust laws. *Id.* at 927. The *Steamfitters* court then went on to explain that:

> the Funds' claims of direct injury include allegations that they were in the market for safer tobacco products or for products that would reduce or prevent people from smoking. Therefore, these claims might meet the third factor from *AGC.* If the Funds were consumers in a market for information and products that would have reduced their expenditures (because they allegedly would have provided the information and products to their participants, some of whom would have smoked less and become less ill), their asserted injuries as consumers—may be of the appropriate type.

*Id.*

Turning to the nature of the Plaintiffs' claimed injuries and whether they relate to the purpose of the federal antitrust laws, i.e. ensuring competition within economic markets, I find that to the extent Plaintiffs' claimed injuries are based upon: (1) their status as potential customers in the market for safer cigarettes or other nicotine products that would reduce or prevent their Medicaid, medically indigent or non-paying patients with tobacco-related illnesses from smoking or (2) their status as consumers in the market for information related to the effects of tobacco use on health and information related to alternative tobacco products which would have reduced their expenditures for care provided to the Medicaid, medically indigent and non-paying patients they treated for tobacco-related diseases, said injuries "may be of the appropriate type" *Id.* at 927. To the extent, however, Plaintiffs' claims are premised "simply on *indirect* cost increases from [their providing medical services

to their Medicaid, medically indigent and non-paying patients with] smoking-related illnesses," said injuries are not the type sought to be protected by anti-trust laws because "the [Plaintiffs] are not consumers forced to pay higher prices for tobacco products or competitors harmed by defendants' ability to conceal the unsafe nature of their products. They are simply some of the many groups or individuals suffering the financial or medical repercussions of the decades-long marketing of a product that we know now is demonstrably unsafe." *Id.*

Turning next to the inquiry of "the directness or indirectness of the asserted injury," again the court's analysis in *Steamfitters'* provides direction. The court began its analysis on the question of the directness/indirectness of the plaintiff funds' injuries as follows: "[t]he Funds' claims of direct injury might also meet the fourth factor from *AGC*, which focuses on the directness or indirectness of the alleged injury. Subsumed in the 'directness' factor is also the issue of whether other, more directly injured parties could vindicate the policies underlying the antitrust laws.... While more direct injured parties existed in *AGC* ..., this is not necessarily the case here. Smokers can sue for personal injuries arising from smoking, but they are unlikely (or unable) to press antitrust claims against the tobacco companies." *Id.* The court continued:

we question [however] whether these direct injuries are necessarily more direct than the indirect injuries on which much of our discussion has focused. Under plaintiffs' direct theory, the tobacco companies' conduct aimed at the Funds induced the Funds to not take certain actions, which led to a greater incidence of smoking (and of smokers using more dangerous products), which led to more illness, which led to increased health care expenditures being borne by the plaintiffs. Although the alleged wrongdoing was more directly aimed at the Funds, the injury itself certainly was no more direct than the indirect injury that

arose from the defendants' actions towards smokers.

*Id.*

Under the precedent set forth above in *Steamfitters,* clearly to the extent that the Plaintiffs' claims are based simply on indirect cost increases from smoking-related injuries, said injuries are not "direct." Further, as the *Steamfitters* court concluded, to the extent the Plaintiffs' antitrust claims relate to the Defendants' intentional conduct towards the Plaintiffs, while the conduct was allegedly directed at the Plaintiffs, the injuries allegedly suffered by the Plaintiffs as a result of said conduct were "no more direct than the indirect injur[ies] that arose from the defendants' actions towards smokers." *Id.*

Turning next to the *AGC* inquiry of whether the "damages claim is ... highly speculative," I find, as did the *Steamfitters* court, that "the [plaintiffs'] damages claims are quite speculative (and very difficult to measure)." *Id.* at 928–29. As explained by the *Steamfitters* court:

[t]he [Plaintiffs'] alleged damages are said to arise from the fact that the tobacco companies prevented the[m] from providing smoking-cessation or safer smoking information [or safer tobacco products] to their [Medicaid, medically indigent and non-paying patients], some of whom would have allegedly quit smoking or begun smoking safer products, reducing their smoking-related illnesses, and thereby lowering the [Plaintiffs'] costs for [providing unreimbursed medical services to said patients]. In order to calculate the damages—i.e., the costs not lowered due to the antitrust conspiracy—the [Plaintiffs] must demonstrate how many smokers would have stopped smoking if provided with smoking-cessation information, how many would have begun smoking less dangerous products, how much healthier these smokers would have been if they had taken these actions, and the savings the [Plaintiffs] would have realized by [having to provide fewer unreimbursed medical services to Medicaid, medically

indigent and non-paying patients] for smoking-related illnesses.

*Id.* at 929.

Finally, concerning the goals of "keeping the scope of complex antitrust trials within judicially manageable limits," i.e., "avoiding either the risk of duplicate recoveries on the one hand, or the danger of complex apportionment of damages on the other," I conclude that I am not overly concerned that there is any real risk of duplicate recoveries or complex apportionment of damages under the allegations underlying the antitrust claims set forth in the First Amended Complaint. I do, however, agree with the *Steamfitters* court's concern that to the extent the Plaintiffs' Medicaid, medically indigent and non-paying patients have suffered some sort of pecuniary loss as a result of the Defendants' alleged conspiracy, for example, increased cigarette prices, then they too could bring antitrust and RICO (as well as personal injury claims) against the Defendants and "[t]herefore, to some minimal extent at least, an apportionment of damages between health care payers and smokers might be necessary." *Id.* at 928, n. 10.

Thus, in conclusion, after review of all of the *AGC* factors in light of the allegations contained in the Plaintiffs' First Amended Complaint, I find that "however plaintiffs characterize their claims—as direct or indirect—they necessarily fail for being too remotely connected in the causal chain from any wrongdoing on defendants' part." *Id.* at 928. Simply stated, "[t]he tortured path that one must follow from the tobacco companies' alleged wrongdoing to the [Plaintiffs'] increased expenditures demonstrates that the plaintiffs' claims are precisely the type of indirect claims that the proximate cause requirement is intended to weed out...." *Id.* at 930. *See also Id.* at 932 ("[t]he injuries that [Plaintiffs] allegedly suffered from defendants' wrongdoing are simply too remote from that wrongdoing to be cognizable under the antitrust laws. The causal links that plaintiffs must connect in order to make their case are just too numerous and too speculative...."). Plaintiffs' antitrust claims

against Defendants are dismissed as a matter of law for failure to state a claim upon which relief can be granted.

2. *Plaintiffs' RICO Claims (Counts I, II and III).*

▮ In order to determine proximate causation in RICO cases, three factors must be considered: (1) the directness of the injury; (2) the difficulty of apportioning damages among potential plaintiffs; and (3) the possibility of other plaintiffs vindicating the goals of RICO. *Holmes v. Securities Investor Protection Corp.,* 503 U.S. 258, 268–69, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992); *Callahan v. A.E.V., Inc.,* 182 F.3d 237, 242 (3d Cir.1999); *Steamfitters,* 171 F.3d at 932. These factors are critical because "(1) the more indirect the injury, 'the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to [defendant's wrongdoing] as distinct from other, independent, factors'; (2) allowing recovery by indirectly injured persons would require complicated rules for apportioning damages; and (3) direct victims could generally be counted on to vindicate the policies underlying the relevant law." *Steamfitters,* 171 F.3d at 932, *quoting, Holmes,* 503 U.S. at 269–70, 112 S.Ct. 1311.

Regarding the directness of the Plaintiffs' alleged injuries, as explained by the *Steamfitters* court: "[a]pplied to the present case, if the [Plaintiffs] are allowed to sue, the court would need to determine the extent to which their increased costs for smoking related illnesses resulted from the tobacco companies' conspiracy to suppress health and safety information [and safer tobacco products], as opposed to smokers' other health problems, smokers' independent (i.e., separate from the fraud and conspiracy) decisions not to smoke, smokers' ignoring of health and safety warnings, etc.... [T]his causation chain is much too speculative and attenuated to support a RICO claim." *Id.* at 933 (internal footnote omitted).

Concerning the inquiry of the apportionment of damages, as stated by the *Steamfitters* court:

as we noted in our discussion of the [Plaintiffs'] antitrust claims, more directly injured parties, i.e., smokers, would be unlikely to bring federal claims against the tobacco companies for the same damages claimed by the Funds. Yet, as we also noted above, [smokers] who have not been fully reimbursed for their out-of-pocket costs that are traceable to defendants' alleged fraud and conspiracy might bring RICO or antitrust claims. Therefore, as in *Holmes*, a court adjudicating the [Plaintiffs'] RICO claims would need to consider the appropriate apportionment of damages between smokers and others such as the [Plaintiffs] who suffered economic losses as a result of the tobacco companies' alleged fraudulent acts.

*Id.*

Last, concerning the issue of whether others could generally be counted on to vindicate the Plaintiffs' RICO claims, I agree that this factor weighs in favor of Plaintiffs being able to bring the instant RICO claims in that they are alleging to have suffered far greater economic damages than did the smokers themselves. However, "[y]et we are unconvinced that this distinction is sufficient to overcome the concerns about apportioning damages and, most fundamentally, the remoteness of the Funds' alleged RICO injuries from any wrongdoing on the part of the tobacco companies." *Id.* at 933–34.

Thus, for the reasons stated above, I find that the Plaintiffs' alleged injuries are too remote from the Defendants' alleged conduct to be able to state any RICO claims against the Defendants. Defendants' Motions to Dismiss Plaintiffs' RICO claims for failure to state a claim upon which relief can be granted are granted.

### 3. *Fraudulent Misrepresentation, Fraudulent Concealment, and Negligent Misrepresentation and Omission Claims (Counts VI, VII and VIII).*

■ In order to prove their state law fraud and negligence claims against Defendants, Plaintiffs would have to be able to establish that their injuries were proximately caused by Defendants' conduct. *Steamfitters*, 171 F.3d at 934–35, 937 n. 23 (fraudulent misrepresentation and negligence claims); *Scaife Co. v. Rockwell–Standard Corp.*, 446 Pa. 280, 285 A.2d 451, 454 (1971), *cert. den'd*, 407 U.S. 920, 92 S.Ct. 2459, 32 L.Ed.2d 806 (1972) (fraudulent misrepresentation claim); *Delahanty v. First Pennsylvania Bank, N.A.*, 318 Pa.Super. 90, 464 A.2d 1243, 1252 (1983) (fraud claim); *Fort Washington Resources, Inc. v. Tannen*, 858 F.Supp. 455, 459, 461 (E.D.Pa.1994) (fraud and negligent misrepresentation claims). "Just as we have found the link between defendants' alleged fraud—providing false information regarding the safety of their products—and plaintiffs' alleged injuries too attenuated to support a RICO claim, we also find the link too remote to support a common-law fraud claim." *Steamfitters*, 171 F.3d at 935, *citing Gibbs v. Ernst*, 538 Pa. 193, 647 A.2d 882, 889 (1994); *Crawford v. Pituch*, 368 Pa. 489, 84 A.2d 204 (1951). For the reasons set forth above with respect to Plaintiffs' antitrust and RICO claims, I find as a matter of law that in the instant case, the causal connection between the Defendants' alleged fraudulent and/or negligent misrepresentations or omissions and the Plaintiffs' alleged injuries are too remote to support Plaintiffs' state law fraudulent misrepresentation, fraudulent concealment and negligent misrepresentation claims. Defendants' motions to dismiss said claims for failure to state a claim upon which relief can be granted are granted.

### 4. *Breach of Special Duty Claim (Count IX).*

In *Steamfitters*, the court explained with respect to breach of special duty claims that "a special duty claim is effectively a negligence cause of action, and therefore requires the element we have found missing from plaintiffs' case, proximate cause. . . ." *Steamfitters*, 171 F.3d at 936. Given my conclusion that the element lack-

ing from Plaintiffs' case against Defendants in general is proximate cause between Defendants' conduct and Plaintiffs' injuries, Plaintiff's breach of special duty claim, premised upon the Defendants' publication of information, representations to and omissions from the public, including the Plaintiffs, also must fail as a matter of law. Defendants' Motions to Dismiss Plaintiffs' breach of special duty claim for failure to state a claim upon which relief can be granted are granted.

### 5. *Plaintiffs' Remaining State Law Claims.*

While the Defendants argue that all of the Plaintiffs' claims against them must be dismissed based upon remoteness doctrine, a review of the elements of the Plaintiffs' remaining state law claims against the Defendants, public nuisance, aiding and abetting, civil conspiracy, restitution/unjust enrichment, indemnity, and quantum meruit, does not indicate that proximate causation is an element of said claims. Therefore, I find it necessary to turn to the Defendants' alternative arguments as to why said claims should be dismissed.

### B. *Plaintiffs' Remaining Claims Against Defendants.*

#### 1. *Public Nuisance Claim (Count X).*

 "A public nuisance is 'an unreasonable interference with a right common to the general public'." *Philadelphia Elec. Co. v. Hercules, Inc.,* 762 F.2d 303, 315 (3d Cir.), *cert. den'd,* 474 U.S. 980, 106 S.Ct. 384, 88 L.Ed.2d 337 (1985), *quoting,* Restatement (Second) of Torts § 821B(1). Further:

[c]ircumstances that may sustain a holding that an interference with a public right is unreasonable include the following:

(a) whether the conduct involves a significant interference with the public health, the public safety, the public peace, the public comfort or the public convenience;

(b) whether the conduct is proscribed by a statute, ordinance or administrative regulation, or

(c) whether the conduct is of such a continuing nature or has produced a permanent or long-lasting effect, and, as the actor knows or has reason to know, has a significant effect upon the public right.

Restatement (Second) of Torts § 821B. "In order to recover damages in an individual action for a public nuisance, one must have suffered harm of a kind different from that suffered by other members of the public exercising the right common to the general public that was the subject of interference." *Id.* at § 821C(1). *See also Pennsylvania Society for the Prevention of Cruelty to Animals v. Bravo Enterprises, Inc.;* 428 Pa. 350, 360, 237 A.2d 342, 343 (1968) ("a public nuisance may be enjoined at the behest of a private citizen or a group of citizens, if the latter, in either their property or civil rights, are specifically injured by the public nuisance over and above the injury suffered by the public generally."). "To constitute a public nuisance, the conduct must be an inconvenience or troublesome offense that annoys the whole community in general, and not merely some particular person." *Feeley v. Borough of Ridley Park,* 121 Pa.Cmwlth. 564, 551 A.2d 373, 375 (1988).

 Defendants first move to dismiss Plaintiffs' public nuisance claim on the basis that "the defendants' alleged conduct— failure to disseminate complete and truthful information about their cigarettes— cannot by its nature interfere with a 'public' right. Rather, ... the persons affected by the defendants' alleged misconduct here are defendants' customers, the narrow subset of the general public that smokes. Because there was not interference with a public right, the nuisance claim must be dismissed." Defendants' Supporting Brief, pp. 15–16. Alternatively, Defendants argue that the Plaintiffs lack standing to assert a public nuisance claim because they have not alleged that

they suffered "harm of a kind different from that suffered by other members of the public." *Id.* at p. 16, *quoting,* Restatement (Second) of Torts, § 821C(1). "The Hospitals have not alleged any special harm 'over and above' that caused to the general public. In fact, the costs of medical services for which the Hospitals seek recovery are entirely coincident with, and derivative of, the harm allegedly caused to their patients, the smokers." *Id.* at p. 16.

In response, Plaintiffs first argue that the class of people affected by Defendants' alleged conduct consists of approximately 50 millions Americans, including millions of Pennsylvania residents and therefore, the alleged conduct affected the whole community in general. Plaintiffs' Opposition Brief, p. 22. They also argue that the Defendants ignore the direct harm they inflicted on the Hospitals and that as a result of the Defendants' conduct, they suffered a harm of greater magnitude than the general public. *Id., citing, Philadelphia Elec. Co., supra.*

After careful consideration of the submissions of the parties, I find that while arguably the Defendants' alleged conduct affected the whole community in general, the Plaintiffs have not sufficiently alleged a harm suffered by them that was different from/of a greater magnitude than the harm suffered by other members of the general public exercising the right common to the general public that was the subject of interference. Accordingly, Defendants' motions to dismiss Plaintiffs' public nuisance claim for failure to state a claim upon which relief can be granted are granted.

### 2. *Aiding and Abetting and Civil Conspiracy Claims (Counts XI and XV).*

▮ Defendants also move to dismiss Plaintiffs' aiding and abetting and civil conspiracy claims. In support of their motion, Defendants argue that dismissal is warranted because Plaintiffs have failed to plead any actionable tortious conduct by Defendants and because the Plaintiffs have failed to identify which alleged wrongdoers caused which alleged injuries, i.e. "[t]he

Hospitals therefore have not satisfied the strict standard for pleading proximate cause on a conspiracy or a concert of action theory." In Pennsylvania, "[t]o state cause of action for civil conspiracy, the following results are required: '(1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose; (2) an overt act in pursuance of the common purpose; and (3) actual damage'." *Strickland v. University of Scranton,* 700 A.2d 979, 987–88 (Pa.Super.1997), *quoting, Smith v. Wagner,* 403 Pa.Super. 316, 320–24, 588 A.2d 1308, 1311–12 (1991). Moreover, "[a] claim for civil conspiracy can only proceed when there is a cause of action for the underlying act." *Caplan v. Fellheimer Eichen Braverman & Kaskey,* 884 F.Supp. 181, 184 (E.D.Pa.1995), *citing, Nix v. Temple Univ. of Com. System of Higher Educ.,* 408 Pa.Super. 369, 596 A.2d 1132, 1137 (1991). *See also Pelagatti v. Cohen,* 370 Pa.Super. 422, 432, 536 A.2d 1337, 1342 (1987), *appl den'd,* 519 Pa. 667, 548 A.2d 256 (1988) ("[a]bsent a civil cause of action for a particular act, there can be no cause of action for civil conspiracy."). Similarly, under a concert of action theory, "[f]or harm resulting to a third person from the tortious conduct of another, one is subject to liability if he (a) does a tortious act in concert with another or pursuant to a common design with him. *Skipworth by Williams v. Lead Industries Ass'n, Inc.,* 547 Pa. 224, 236, 690 A.2d 169, 174 (1997).

Given that Plaintiffs have failed to sufficiently plead any actionable tortious conduct by Defendants, Plaintiffs' claims for civil conspiracy and aiding and abetting must be dismissed for failure to state a claim upon which relief can be granted.

### 3. *Restitution/Unjust Enrichment Claim (Count XIII).*

▮ As explained by the *Steamfitters* court in relevant part:

[i]n the tort setting, an unjust enrichment claim is essentially another way of

stating a traditional tort claim (i.e., if defendant is permitted to keep the benefit of his tortious conduct, he will be unjustly enriched). As the Restatement of Restitution puts it:

[t]he desirability of permitting restitution in [tort] cases is ordinarily not so obvious as in the cases where there has been no tort since the tortfeasor is always subject to liability in an action for damages and ... the right to maintain an action for restitution in such cases is largely the product of imperfections in the tort remedies, some of which imperfections have now been removed.

Restatement of Restitution, § 3 cmt. a (1937); *see also id.* at ch. 7 introductory note ("Actions of tort are ordinarily not restitutionary.... They are based primarily upon wrongdoing and ordinarily, through the payment of money, compensate the injured person for the harm suffered by him as a result of the wrongful conduct, irrespective of the receipt of anything by the defendant"). We can find no justification for permitting plaintiffs to proceed on their unjust enrichment claim once we have determined that the District Court properly dismissed the traditional tort claims because of the remoteness of plaintiffs' injuries from defendants' wrongdoing.

*Steamfitters*, 171 F.3d at 936–37. I agree that it would be improper to allow Plaintiffs to proceed with their restitution/unjust enrichment claim against Defendants having determined that their traditional tort claims must be dismissed because of the remoteness of the Plaintiffs' alleged injuries from the Defendants' alleged conduct. Accordingly, Plaintiffs' claim for restitution/unjust enrichment against Defendants is dismissed for failure to state a claim upon which relief can be granted.

### 4. *Indemnity Based On Intentional and/or Reckless Conduct Claim (Count XII).*

 In Count XII of their First Amended Complaint, Defendants move to dismiss Plaintiffs' claim that Defendants should indemnify them for the unreimbursed costs of providing medically necessary care and services to Medicaid, medically indigent and non-paying patients injured by use of Defendants' tobacco products. Specifically, Defendants argue that "[u]nder Pennsylvania law, indemnity is only available: (1) where there is an express contract to indemnify; or (2) where the party seeking indemnification was secondarily liable for the indemnitor's acts," and neither scenario exists under the facts alleged in Plaintiffs' First Amended Complaint. Defendants' Supporting Brief, p. 17.

In response, Plaintiffs argue: (1) Defendants misconstrue indemnity case law when they argue that Plaintiffs cannot state a claim for indemnity because Plaintiffs are primarily liable for the costs of medical care for patients with tobacco-related disease; (2) Defendants are wrong when they argue that the Hospitals are primarily liable for the costs of medical care for Medicaid, medically indigent and non-paying patients with tobacco-related disease; (3) Plaintiffs are not "liable" to these patients; and (4) Defendants are primarily liable for the injuries that the Defendants caused to the smokers who the Plaintiffs treated for tobacco-related diseases. Plaintiffs' Opposition Brief, p. 23.

In *Builders Supply Co. v. McCabe*, 366 Pa. 322, 77 A.2d 368 (1951), the Pennsylvania Supreme Court explained the concept of indemnity claims:

[t]he right of indemnity rests upon a difference between the primary and secondary liability of two persons each of whom is made responsible by the law to an injured party. It is a right which enures to a person who, without active fault on his own part, has been compelled, by reason of some legal obligation, to pay damages occasioned by the initial negligence of another, and for which he himself is only secondarily liable. The difference between primary and secondary liability is not based on a difference in degrees of negligence or on any doctrine of comparative negli-

gence,—a doctrine which, indeed, is not recognized by the common law. It depends on a difference in the character or kind of the wrongs which cause the injury and in the nature of the legal obligation owed by each of the wrongdoers to the injured party.

. . . . .

[I]t is clear that the right of a person vicariously or secondarily liable for a tort to recover from one primarily liable has been universally recognized. But the important point to be noted in all the cases is that secondary as distinguished from primary liability rests upon a fault that is imputed or constructive only, being based on some legal relation between the parties, or arising from some positive rule of common or statutory law or because of a failure to discover or correct a defect or remedy a dangerous condition caused by the act of the one primarily responsible.

*McCabe*, 366 Pa. at 325–28, 77 A.2d at 370–71 (internal citation omitted). Clearly, the facts pled in the Plaintiffs' First Amended Complaint, where Plaintiffs are neither vicariously nor secondarily liable for any torts committed upon their Medicaid, medically indigent or non-paying patients with tobacco-related diseases by Defendants, are not the type of facts which give rise to an indemnity action. Accordingly, Defendants' Motions to Dismiss Plaintiffs' indemnity action for failure to state a claim upon which relief can be granted are granted.

5. *Quantum Meruit Claim (Count XIV).*

 Finally, Defendants move to dismiss the Plaintiffs' quantum meruit claim against them. The Plaintiffs' quantum meruit claim is premised upon the theory that by paying for the medical services of its Medicaid, medically indigent and non-paying patients with tobacco-related diseases, Plaintiffs satisfied the Defendants' legal duties and saved them from initially bearing the costs for harm proximately caused by their fraudulent and wrongful conduct. Specifically, Defendants move to

dismiss this claim on the basis that in order for the Plaintiffs to recover damages under a theory of quantum meruit, there must have been either "(1) an implied contract between the parties, or (2) plaintiff must have performed services *for the defendant* for which the plaintiffs had a reasonable expectation of compensation." Defendants' Supporting Brief, p. 20 (emphasis in original). "Plaintiffs certainly have not alleged that there was an implied contract between the Hospitals and the tobacco companies under which the tobacco industry was obligated to pay for the health care costs of smokers. Nor did the plaintiffs provide a service to the defendants for which they reasonably expected compensation. *See* Amended Compl., ¶¶ 373–79. Instead, plaintiffs provided services to smokers, from which they expected to be paid, if at all, by the smokers themselves, or by Medicaid." *Id.*

In response, Plaintiffs contend that Defendants misread Plaintiffs' First Amended Complaint and state: "[a]t paragraph 377, the Hospitals allege that 'Defendants impliedly promised to pay the Hospital Plaintiffs for their valuable services rendered as a result of their wrongful conduct . . .' At paragraph 376, the Hospitals allege that they 'reasonably expected to be reimbursed their usual and customary fees to provide such services.' *See also* FAC ¶ 377 ("Defendants knew Hospitals incurred costs to treat tobacco-related illness caused by Defendants' wrongful conduct and that Hospitals would reasonably expect to be paid for their services.")." Plaintiffs' Opposition Brief, pp. 24–25.

"Quantum meruit is an implied contract remedy based on payment for services rendered and on prevention of unjust enrichment. . . . [A] promise to pay for services may only be implied when such services are rendered in such circumstances where the performing party entertains a reasonable expectation of being paid by the party benefited." *Aloe Coal Co. v. Department of Transp.*, 164 Pa.Cmwlth. 453, 643 A.2d 757, 767 (1994), *citing, Mar-*

*tin v. Little, Brown and Co.*, 304 Pa.Super. 424, 450 A.2d 984 (1981). After careful consideration of the submissions of the parties on this issue and the factual allegations pled in the Plaintiffs' First Amended Complaint, I find that under the facts pled in Plaintiffs' First Amended Complaint, *see* in particular ¶¶ 376 and 377 of the First Amended Complaint,[3] contrary to Plaintiffs' contentions, it cannot be inferred from Defendants' alleged conduct that they impliedly promised to pay Plaintiffs for the medical services Plaintiffs provided to Medicaid, medically indigent and non-paying patients with tobacco-related illnesses or that at the time Plaintiffs rendered said medical services, they did so reasonably expecting to be reimbursed by Defendants for their usual and customary fees to provide such services. Accordingly, Defendants' Motions to Dismiss Plaintiffs' quantum meruit claim for failure to state a claim upon which relief can be granted are granted.

### C. *Defendants' no cognizable injury argument.*

Defendants also argue in support of their Motions to Dismiss that all of the Plaintiffs' claims against them must be dismissed because Plaintiffs' have suffered no cognizable injury. Given my above de-

terminations with respect to the sufficiency of the Plaintiffs' federal and state law claims against Defendants, it is not necessary to address this argument and therefore, I elect not to do so.

### *ORDER OF COURT*

**AND NOW,** this **4th** day of November, 1999, after careful consideration and for the reasons set forth in the accompanying Opinion, it is **ORDERED** that the Motion to Dismiss of Philip Morris Incorporated, R.J. Reynolds Tobacco Company, Brown & Williamson Tobacco Corporation (individually and as successor by merger to The American Tobacco Company), Lorillard Tobacco Company, United States Tobacco Company, The Tobacco Institute, Incorporated, The Council for Tobacco Research–USA, Incorporated, Hill & Knowlton, Inc. (Docket No. 19) and the Motion to Dismiss the Liggett Group, Inc. (Docket No. 22) are **GRANTED** and Plaintiffs' First Amended Complaint against these named Defendants is **DISMISSED** *with prejudice.*

---

**3.** In toto, ¶¶ 376 and 377 of Plaintiffs' First Amended Complaint state:

376. The Hospital Plaintiffs acted unofficiously, were required by law and/or morality to provide such health care, did not volunteer to provide such health care free of charge, intended to charge for such services and reasonably expected to be reimbursed their usual and customary fees to provide such services.

377. The [Hospital Plaintiffs] have expended sums to diagnose and treat tobacco-related illnesses caused by Defendants' wrongful conduct and for which the Defendants had, and continue to have a duty to pay, but have avoided paying by deceit, mendacious lobbying efforts, propaganda, scorched-earth and illicit and deceptive litigation tactics and other means. The Defendant Tobacco Companies knew or reasonably should have known that the Hospital Plaintiffs would be required to bear health care costs attributable to Defendants' con-

duct. Defendants knew of and appreciated the benefits that the Hospital Plaintiffs' bearing of such health care costs conferred on Defendants. At no time did the Defendants, or any of them, inform the Hospital Plaintiffs that Defendants would not reimburse the Hospital Plaintiffs for the cost of treating the Hospital Plaintiffs' Medicaid, medically indigent and non-paying patients despite Defendants' knowledge that the health care expenses that the Hospital plaintiffs incurred to treat tobacco-related illnesses were caused by the Defendants' wrongful conduct and that the Hospital Plaintiffs would reasonably expect to be paid for their services. Under these circumstances, the Defendants impliedly promised to pay the hospital Plaintiffs for their valuable services rendered as a result of their wrongful conduct, and it would be inequitable, unconscionable and unjust not to enforce their implied promise.

First Amended Complaint, ¶¶ 376–77.