### PEOPLE 2.0 GLOBAL, INC., Petitioner

### v.

### COMMONWEALTH of Pennsylvania, DEPARTMENT OF LABOR AND INDUSTRY, OFFICE OF UNEMPLOYMENT TAX SERVICES, Respondent.

Commonwealth Court of Pennsylvania.

Argued Sept. 8, 2014.
Decided Nov. 20, 2014.

---

'Brian Nugent, Fort Collins, CO, for petitioner.

Arthur Selikoff, Assistant Counsel, Harrisburg, for respondent.

BEFORE: DAN PELLEGRINI, President Judge, and BONNIE BRIGANCE LEADBETTER, Judge, and ROBERT SIMPSON, Judge.

## OPINION

OPINION BY Judge LEADBETTER.

People 2.0 Global, Inc. (People) petitions for review of the order of the Department of Labor and Industry (Department) affirming the assessment of a $10,000 penalty, which was imposed as a result of People's failure to file a quarterly report [commonly referred to as the Professional Employer Organization (PEO) report] pursuant to Section 315(a)(4) of the Unemployment Compensation Law (Law),[1] 43 P.S. § 795(a)(4), for the first quarter of 2010. On appeal, People primarily argues that, because it constitutes an "employer" as that term is defined by the Law, it was not required to file the Section 315(a)(4)

report, rendering the assessed penalty improper. After review, we affirm.

In 2004, Congress enacted the SUTA Dumping Prevention Act of 2004 (Prevention Act),[2] 42 U.S.C. § 503(k), to address employers' manipulation of experience rating systems to achieve a lower unemployment compensation tax than their actual unemployment compensation experience would actually allow.[3] *See generally* Department of Labor, Employment and Training Administration, *Workforce Security Programs: Unemployment Insurance Program Letter Interpreting Federal Law,* Section 3 (Background) (September 30, 2004), 69 Fed.Reg. 58550–02. According to the Department of Labor, these tax avoidance schemes often included mergers, acquisitions, and restructuring plans involving the transfer of a work force from the payroll of one entity to the payroll of another entity with a lower tax rate.[4] *Id.*

1. Act of December 5, 1936, Second Ex.Sess., P.L. (1937) 2897, *as amended.* Section 315 was added by Section 7 of the Act of June 15, 2005, P.L. 8.

2. "SUTA" refers to state unemployment tax acts. Colloquially, "SUTA" may also be used to indicate state unemployment tax avoidance.

3. An employer's unemployment history (i.e., the amount of unemployment compensation paid to former employees) impacts its experience rate and, therefore, its tax rate. *See* Section 301.1 of the Law, added by the Act of December 17, 1959, P.L. 1893, 43 P.S. § 781.1.

4. Consequently, Section 503(k) of the Prevention Act (entitled, "Transfer of unemployment experience upon transfer of business") provides in pertinent part:

(1) For purposes of subsection (a) of this section [pertaining to requirements for States to qualify for federal payments under the Federal Unemployment Tax Act, 26 U.S.C. § 3301, et. seq.], the unemployment compensation law of a State must provide—

(A) that if an employer transfers its business to another employer, and both employers are (at the time of transfer) under substantially common ownership, management, or control, then the unemployment experience attributable to the transferred business shall also be transferred to (and combined with the unemployment experience attributable to) the employer to whom such business is so transferred,

(B) that unemployment experience shall not, by virtue of the transfer of a business, be transferred to the person acquiring the business if—

(i) such person is not otherwise an employer at the time of such acquisition, and

(ii) the State agency finds that such person acquired the business solely or primarily for the purpose of obtaining a lower rate of contributions,

(C) That unemployment experience shall (or shall not) be transferred in accordance with such regulations as the Secretary of Labor may prescribe to ensure that higher rates of contributions are not avoided through the transfer or acquisition of a business,

. . . .

The California Court of Appeal cogently described SUTA dumping as follows:

> In [SUTA] dumping, one employer transfers employees or payroll wages to another employer in order to take advantage of the other employer's lower unemployment insurance tax rate. In essence, the first employer "dumps" payroll with a higher contribution rate into the second employer's unemployment insurance account with a lower rate.

*Empl. Dev. Dep't v. Ca. Unempl. Ins. Appeals Bd.*, 190 Cal.App.4th 178, 118 Cal. Rptr.3d 167, 169–70 (2010). *See also* Department's website, addressing "2005 Changes to PA UC law[; including] What is SUTA Dumping:" "The term 'SUTA Dumping' refers to attempts by employers with high UC costs to 'dump' their experience in order to obtain an artificially low contribution rate." [5] Following enactment of the federal Prevention Act, the Commonwealth's Law was amended to provide for the transfer of unemployment experience in the situations addressed in 42 U.S.C. § 503(k). *See* Section 301 of the Law, 43 P.S. § 781.

In addition and relevant to the instant appeal, Section 4(j)(2.1) of the Law, 43 P.S. § 753(j)(2.1) (pertaining to the identity of the employer in certain work force transfer arrangements), was added in 2005 [6] to designate the entity deemed to be the employer following a transfer of employees between entities that results in a shared management arrangement. [7] Prior to the enactment of Section 4(j)(2.1), the Department applied a direction and control test to determine which entity was the employer of the transferred workers and, therefore, responsible for the obligations and assessments required by the Law. *See Cameron v. Dep't of Labor & Indus., Bur. of Employer Tax Oper.*, 699 A.2d 843 (Pa. Cmwlth.1997). However, pursuant to a Section 4(j)(2.1) arrangement, the entity which transfers its employees (often referred to as the "client" in a professional employer arrangement) is deemed to be the employer for purposes of the Law.

Specifically, Section 4(j)(2.1) of the Law provides:

> An individual or entity that transfers some or all of its work force to the payroll of another individual or entity, directly or indirectly, as part of or re-

---

(E) for the establishment of procedures to identify the transfer or acquisition of a business for purposes of this subsection. 42 U.S.C. § 503(k)(1).

5. *www.pa.gov/portal/server.pt/community/pa_ uc_aw/10346/2005_uc_law change.*

6. Specifically, Section 4(j)(2.1) was added by Section 1 of the Act of June 15, 2005, P.L. 8.

7. Many of these transfers resulting in a co-employer arrangement were referred to as a "professional employer arrangement." The Department's website generally describes a professional employer arrangement as:

> A professional employer arrangement is an arrangement between a business, called the client, and a "Professional Employer Organization" or "PEO," whereby the client

leases some or all of its workforce from the PEO. Typically, the leased workers were employees of the client prior to the arrangement. At the beginning of the arrangement, the client transfers its workers to the PEO and then leases them back from the PEO.

*www.pa.gov/portal/server.pt/community/ professional_employer_arrangements.* While not relevant here, the Professional Employer Organization Act, Act of July 5, 2012, P.L. 946, 43 P.S. §§ 933.101–933.304, went into effect on January 2, 2013. A professional employer arrangement is defined under that act as a contract between a client and a professional employer organization (PEO) that provides for the co-employment of covered employees and an allocation of rights and obligations between the client and PEO regarding the covered employees. Section 102, 43 P.S. § 933.102.

sulting in an arrangement whereby the individual or entity shares employer functions with respect to some or all of its work force with the other individual or entity shall be the employer of the employe or employes covered by the arrangement with the other individual or entity. This paragraph shall include, without limitation, an arrangement known as a professional employer arrangement or employe leasing arrangement. This paragraph does not include a temporary help arrangement in which an individual or entity utilizes one or more workers supplied by another individual or entity to supplement its work force in special, temporary work situations such as absences, skill shortages, seasonal work loads and special assignments.

Thus, when Section 4(j)(2.1) applies, the original employer is deemed to be the employer of the transferred work force for purposes of the Law.[8] Although the transferee entity shares employer functions in a qualifying Section 4(j)(2.1), as a matter of law, it is not the employer for purposes of the unemployment compensation system.[9]

Both the employer (transferor) and transferee are charged with separate reporting obligations under the Law. *See*

Section 304 of the Law, 43 P.S. § 784 (reports by employers); 34 Pa.Code § 63.52 (quarterly reports from employers, which detail, *inter alia,* name/SS# of each employee paid wages during the quarter, the amount of wages paid to each employee, and the number of credit weeks for each employee); Section 315 of the Law, 43 P.S. § 795 (registration and other reports, including reports by PEOs), 34 Pa. Code § 63.59 (PEO reports). Section 315(a)(4), which requires the report leading to the assessment at issue here, provides:

An individual or entity to whom some or all of a work force is transferred, as part of or resulting in an arrangement described under section 4(j)(2.1) [quoted above], shall file a report with the department for each calendar quarter. The individual or entity may file one report for all such arrangements....

43 P.S. § 795(a)(4). *See also* 34 Pa.Code § 63.59 (PEO reports).[10] An employer or any other person who "wilfully fails or refuses to make any report required by section 315(a)(4)" shall be assessed a civil penalty. Section 802.1(a)(3), added by the Act of June 15, 2005, P.L. 8, 43 P.S. § 872.1(a)(3).

8. As noted on the Department's website: "Pursuant to Section 4(j), the client in a professional employer arrangement, rather than the professional employer organization (PEO), is designated as the employer of the workers leased from the PEO for UC purposes. Accordingly, the workers['] wages must be reported on the client['s] UC tax account and contributions must be paid on those wages at the client['s] tax rate." *www. uc.pa.gov/portal/server.pt/comunity/pa_uc_law/ 10346/prof_employer_arrangement.*

9. This court examined a PEO arrangement in *All Staffing, Inc. v. Commonwealth,* 10 A.3d 389 (Pa.Cmwlth.2010) (en banc), *affirmed,* 614 Pa. 505, 38 A.3d 796 (2012). There, the PEO at issue provided human resources-relat-

ed services to its clients through an arrangement where the client's employees were placed on the PEO's payroll, enabling it to perform all aspects of personnel administration. We generally noted that the appellation "PEO" is broadly applied, including establishments primarily engaged in the provision of human resource-related services through a co-employment relationship with clients and organizations that provide labor or staff leasing services. *Id.* at 392.

10. Interestingly, Section 63.59 does not actually specify the information required to be set forth in the PEO quarterly report, merely stating that the report "shall contain the information" required by the Department's electronic filing system.

Turning to the matter before the court, People describes itself as a "national temporary staffing company that provides employees for temporary assignments at third party locations, and operates its business through a network of local, independent companies (each one referred to as an 'Affiliate')." Reproduced Record (R.R.) at 195a (letter from Peoples' counsel to Department). *See also* Affiliate Agreement, ¶ A; R.R. at 198a. In June 2005, People entered into a business relationship with three business entities owned and operated by Denise and Caleb Hobbie, to wit: CK Hobbie, Inc., Hobbie Personnel Management, Inc. and Hobbie Professional Staff Management, Inc. (collectively, "Hobbie"). It appears that the Hobbie entities were temporary staffing agencies located in Allentown and providing temporary staffing services primarily in Pennsylvania. The Affiliation Agreement executed by People and Hobbie provided in pertinent part that:

As a People 2.0 Affiliate, [Hobbie] will maintain its identity and legal status for the purposes described herein; however, *People 2.0 will employ all Staffing Employees who are deployed to perform services at Client locations.*[11] [Hobbie agrees and understands] that notwithstanding the continuing existence of [its] corporate identity and legal status under this Agreement, *[Hobbie is] relinquishing [its] direction and control of the Staffing Employees to People 2.0 and that any direction and control exercised by [Hobbie] after the Agreement Date will be solely and exclusively as the agent of People 2.0.* [Hobbie] will also operate as the marketing and Client services agent (as described herein) of People 2.0 for all temporary staffing business generated by the deployment of People 2.0 Staffing Employees from a [Hobbie] location. [Hobbie] will have authority to determine pricing for Clients and wages for the . . . Staffing Employees on People 2.0's behalf. . . .

R.R. at 198a (Affiliation Agreement, Section 1.1) (emphasis and footnote added). The Agreement also provided:

*People 2.0 shall be the sole employer of all Staffing Employees, and each Staffing Employee will be required to complete all employment documents required by People 2.0.* During the term of this Agreement, all Staffing Employees will receive wages only from People 2.0 and People 2.0 will issue a form W-2 to each Staffing Employee for wages earned during the calendar year . . . for work performed at [Hobbie's] request. Each Staffing Employee will be required to comply with the employment policies

11. "Staffing employees" are defined as any individual People employs as a temporary employee under the Affiliation Agreement and any independent contractor People contracts with who is or was sourced, referred, provided or assigned by Hobbie to a Client for a short-term assignment in exchange for a fee. *See* Reproduced Record (R.R.) at 218a. "Client" is defined, in turn as, "any business entity to which Staffing Employees, other personnel and/or staffing-related services are provided for a fee or other compensation under [the Affiliation Agreement]. *Id.* at 216a. We note that a "client" under the Affiliation Agreement is different than the "client" in a professional employer arrangement; the term refers to a consumer of a different type of service in each situation.

"Core employees" are also covered and defined by the Agreement. Specifically, "core employees" are defined as "employees who do not meet the definition of a Staffing Employee and who [Hobbie employes and supervises] directly to perform work for [Hobbie] and not directly for a client." *Id.* at 217a. People's CEO, David Van Soest, described the core employees as "office-based employees that are in the affiliate's local branch." *Id.* at 99a. Unlike the Staffing Employees, the Core Employees do not provide temporary services to clients. *Id.* at 99–100a.

and standards set forth in the People 2.0 approved Employee Handbook prepared for the local operations.

During the term of this Agreement, People 2.0 is authorizing [Hobbie] to act as its agent for the following purposes: (1) *to recruit, screen, select, manage and deploy Staffing Employees;* (2) market and advertise for temporary help services; and (3) Client support.... [Hobbie] is authorized to review, complete and maintain all required employment documents and *[Hobbie] will also have the authority within the limits of the Agreement to: (i) supervise day-to-day activities of the Affiliate [Hobbie] location; (ii) determine hourly wages ... of the Staffing Employees;* (iii) communicate terms of employment; (4) collect and maintain all new hire paperwork; and *(5) after consultation with People 2.0, discipline, promote, and terminate Staffing Employees. Unless specifically and expressly stated herein, [Hobbie] shall have no other authority or right to act as the agent of People 2.0.*

*Id.* at 198–99a (Affiliation Agreement, Sections 1.2 and 1.3, respectively) (emphasis added). Thus, as noted above, the responsibility for evaluating and hiring Staffing Employees, setting their wages and directing their day-to-day activities and work assignments is delegated to Hobbie. Pursuant to the Agreement, People provides workers' compensation and other types of insurance for the Staffing Employees, pays wages to the Staffing Employees, collects and reports all taxes due on the wages paid and handles all employment-related administration.

The clients/end users of the temporary staffing services pay People directly for the services rendered. Under the Agreement, People takes between 2.5 to 3.0 percent of gross receipts (total money paid by clients to People for services rendered by Staffing Employees) as its share of the revenue. Hobbie receives an Affiliate share of the revenue generated; the Affiliate share equals gross receipts minus total labor costs (wages, taxes, insurance), financing costs of the labor costs (amounts Hobbie pays to cover costs of People's borrowing to pay total labor costs) and People's revenue share.[12] Hobbie also funds a reserve account.

Prior to entering into the Affiliation Agreement with People during the second quarter of 2005, Hobbie had a total workforce of 885 employees and People had a work force of 16 employees. After the Agreement, Hobbie's work force dwindled to 27 employees and People's grew to 1014 employees. In 2005, prior to entering into the Agreement, the Hobbie entities had unemployment compensation rates of .075680 and .082112, and People had an unemployment compensation rate of .02744. In the first quarter of 2010, Hobbie reported wages for 17 employees and People reported wages for 499 employees.

On June 9, 2010, the Department's Office of Unemployment Compensation Tax Services (OUCTS) issued a notice of assessment to People, imposing the $10,000 penalty as a result of People's failure to file the quarterly report required by Section 315(a)(4). People filed a petition for reassessment, contending, in part, that it is a temporary help supply company and not a professional employer organization, rendering Sections 4(j)(2.1) and 315 inapplicable. A hearing followed. Notably, the Department introduced, *inter alia,* the

---

**12.** According to People's CEO, David Van Soest, People recovers the cost of delivering the temporary staffing services, which primarily involves labor-related costs such as wages, payroll taxes, and insurance, and the remaining revenues are shared with the Affiliate.

2005 Affiliation Agreement between People and Hobbie, documents accompanying the Agreement and the various wage reports demonstrating the numbers set forth above. There is no dispute that People has never filed the Section 315(a)(4) quarterly report. Rather, People has been filing the reports required of an employer relative to the Staffing Employees and consequently paying a lower unemployment compensation rate than that previously paid by Hobbie.[13]

People's CEO, David Van Soest, testified in support of the petition for reassessment. Van Soest essentially described Hobbie as a commissioned sales representative, charged with soliciting business in the local market for People's temporary staffing services. Van Soest noted that because People operates in the local market under an Affiliate's trade name, it benefits from the Affiliate's existing name recognition. Van Soest further explained that if Hobbie fails to place any Staffing Employees with customers, Hobbie does not get paid. In addition, Hobbie essentially guarantees the client invoices if a client fails to pay for services rendered. Many of Hobbie's clients were assumed by People. In addition, People was Hobbie's only source of revenue after entering into the Agreement. Van Soest testified that Hobbie's employees were not required to work for People when Hobbie signed the Affiliate Agreement. Rather, Hobbie's former employees were free to look for work elsewhere. Moreover, in order to be hired by People, the former Hobbie employees were required to fill out an application and apply for a job. Van Soest testified in part:

[T]here's a process that leads up to the actual effectiveness of the licensing of the agreement [referring to the execution of the Affiliate Agreement] in the operation of the business, and in the weeks that that process is executed, there's a hiring process for People 2.0.... In other words, there's a hiring process that is executed which is People's process, and, by that process, various temporary workers can become employees of People 2.0. You know, in a temporary staffing environment, there's a continuous flux and a high level of turnover in workers; so, there are people—I mean a temporary staffing firm like People 2.0 is engaged in the hiring business, in a large respect, and there are people applying for jobs all the time, but, with regard to the employees that were deployed by Hobbie previously, those employees went through a process of applying with People 2.0 over a few weeks leading up to that date [of the agreement].... And we had no obligation or requirement or expectation, necessarily, to hire all those people.... So, I mean, yes, there was an opportunity. If there were individuals there that did not meet our standards or could not or would not complete our process, or which we knew from Hobbie's work experience were employees that we wanted [sic] to deploy to our customers, those individuals would not be hired.

R.R. at 156–57a. Van Soest also noted that People was audited by the Department of Revenue for the period January 2005 through December 2007, resulting in additional sales taxes due on revenue generated in its business. According to Van

---

**13.** *See* People's appellate brief at 9, footnote 4 (stating: "If during Q1 2010 Hobbie and [People] were in fact in a PEO arrangement, Hobbie would be deemed the employer of the work force, which would mean that Pennsylvania wages reported by [People] for Q1 2010 payroll should have instead been reported by Hobbie under its unemployment account and tax rate."). *See also* Department's appellate brief at 16 (noting People's rate is 2.7% compared to Hobbie's previous rates of 7.5% and 8.2%).

Soest, the Department of Revenue characterizes People as providing help supply services, the fees for which are taxable under the Tax Reform Code of 1971 (Tax Code), Act of March 4, 1971, P.L. 4, *as amended,* 72 P.S. §§ 7101–10004.[14]

After considering the record, the Department concluded that a transfer of work force within the meaning of Section 4(j)(2.1) of the Law had occurred. While noting it was not clear whether specific employees had transferred from Hobbie to People, it was "clear that an arrangement was entered into whereby a transitory work force previously employed by Hobbie came to work for People 2.0 after that arrangement went into effect." Final Decision and Order at 7. The Department further noted that, "[w]ithout a transfer of work force from Hobbie to [People] at the point of the agreement, such changes to the work force of [People] would be otherwise inexplicable." *Id.* In addition, although the Department noted that People technically maintained the employer relationship with the Staffing Employees under the Agreement, it found that Hobbie continued to perform many typical employer functions for those same employees. The Department also rejected People's argument that designating Hobbie as its agent under the Agreement precluded Hobbie from sharing employer functions for purposes of Section 4(j)(2.1).

In addition, the Department rejected People's argument that the Department of Revenue's treatment of People as a help services supply company for purposes of liability for sales and use tax estopped the Department of Labor and Industry from treating People as a PEO under the Law. Finally, in concluding that People acted "willfully" for purposes of penalty assessment, the Department found that, "[b]y letter dated November 2, 2009, [People] became aware that the [Office of Unemployment Compensation Tax Services] considered it to be a PEO pursuant to Section 4(j) of the Law." Final Decision and Order at 2 (Finding of Fact No. 5). Accordingly, the Department found that People was aware of the reporting requirement and its failure to file the report rendered the penalty proper. The present appeal followed.

■ · We first address People's argument there is a lack of substantial evidence of record to support the finding that Hobbie transferred its work force to People, thereby rendering Section 315(a)(4) of the Law inapplicable.[15] People maintains that the

---

**14.** "Help supply services" are defined by the Tax Code as:

Providing temporary or continuing help where the help supplied is on the payroll of the supplying person or entity, but is under the supervision of the individual or business to which help is furnished. Such services include, but are not limited to, service of a type provided by labor and manpower pools, employe leasing services, office help supply services, temporary help services. . . .

Section 201(cc), added by the Act of August 4, 1991, P.L. 97, 72 P.S. § 7201(cc). Sales tax is imposed on a "sale at retail," which is defined to include the "rendition for a consideration of . . . help supply services." *See* Sections 202 and 201(k)(15), 72 P.S. §§ 7202, 7201(k)(15); *All Staffing, Inc. v. Common-*

*wealth,* 987 A.2d 849, 852 (Pa.Cmwlth.), *affirmed,* 10 A.3d 389 (Pa.Cmwlth.2010) (en banc), *affirmed,* 614 Pa. 505, 38 A.3d 796 (2012).

**15.** Throughout its brief, People argues that the Department's critical fact-finding is not supported by substantial evidence of record. Intermixed with these challenges are contentions that relevant evidence was overlooked or not given due weight, and that only limited evidence was considered to the exclusion of other more pertinent evidence. It is well settled that the agency is charged with the duty of fact-finding, which includes the authority to determine the credibility of witnesses and resolve conflicts in evidence. *Aloe Coal Co. v. Dep't of Transp.,* 164 Pa.Cmwlth. 453, 643 A.2d 757, 762 (1994). An agency's

Department relied exclusively on the wage reports to find that a transfer of Hobbie's work force occurred and that those reports lack sufficient information to support that critical finding. According to People, the wage reports provide only the employee's name, wages earned and number of weeks worked during the quarter; the reports do not state how often the employee worked, whether the employee was full-time or part-time and whether the employee worked for other entities at the same time. People argues:

> [T]here is simply no reasonable basis to conclude from the *Wage Reports* that Hobbie *transferred* any part of its work force to People 2.0. The Wage Reports merely show that *some* employees, whose status as full-time or temporary is unknown, worked for Hobbie for some unknown period of time during the second quarter of 2005, and later worked for some unknown period of time for People 2.0 during the third quarter of 2005. Particularly if Hobbie's work force was "transitory" as alleged by the [Department] in its Decision, the transfer of a work force by Hobbie is not only unsupported by the evidence, it is unlikely.

Appellate brief at 21 (emphasis in original, footnote omitted). According to People, a presumption that a transfer occurred is insufficient to support the finding that a transfer did in fact occur. People does not disagree, however, that it hired Hobbie employees and that there are a number of employees listed on its wage reports that

findings are binding on appeal when they are supported by substantial evidence of record. *Id.* When examining the Department's findings, the record is viewed in the light most favorable to the prevailing party, here, the Office of Unemployment Compensation Tax Services, giving that party the benefit of any inferences that can logically and reasonably be drawn from the evidence. *Stage Road Poultry Catchers v. Dep't of Labor & Indus.,*

appeared on Hobbie's reports prior to entering into the Affiliation Agreement.

People also asserts that the Affiliation Agreement fails to support the finding that a work force transfer occurred. According to People, not only was there no express requirement that Hobbie transfer its work force, but the Agreement was completely silent regarding Hobbie's pre-existing work force. Finally, People notes that Van Soest testified that People was not required to hire Hobbie's employees and any Hobbie employee interested in working for People had to apply for a job and undergo screening. According to People, Van Soest's "uncontroverted testimony outweighs any evidence relied on by the Deputy in the Decision. The Deputy's failure to apply the uncontroverted testimony of [Van Soest] was clearly erroneous. . . ." Appellate brief at 23.

After a review of the record, we conclude this argument lacks merit. First, Section 4(j)(2.1) does not require a formal or contractual transfer of employees as People suggests; the statutory section expressly applies to an indirect transfer of a work force. Moreover, the entire work force need not be transferred for Section 4(j)(2.1) to apply and the section is not limited to transfers involving only full-time employees. Thus, the lack of a formal agreement to employ Hobbie's work force or, the fact that Hobbie employees were required to apply for a job with People, does not preclude a finding that a work force transfer occurred.

*Office of Unemployment Comp. Tax Servs.,* 34 A.3d 876, 885 (Pa.Cmwlth.2011). Moreover, a determination of whether particular findings are adequately supported requires an examination of the entire record. *Id.* at 885–86. The fact that People believes the testimony and exhibits support contrary findings or conclusions is not grounds for reversal as long as there is substantial evidence to support the Department's findings and decision. *Id.*

Second, the Department's finding was not premised solely on the wage reports as alleged; indeed, there is more than adequate support in the record rendering the finding binding on appeal. A close reading of the Department's findings and discussion demonstrates that the Department considered a variety of factors when it concluded that a work force transfer occurred, specifically noting: the change in the size of each entities' work force following the Agreement; Hobbie's acknowledgement in the Agreement that it was *relinquishing its direction and control* over the Staffing Employees *to People;*[16] and People's admission that it hired Hobbie employees.[17] Moreover, while the Department made no findings identifying the specific Hobbie employees that subsequently became employed by People post-Agreement, the factors noted by the Department clearly support the reasonable and logical inference that each entity's change in work force size was due to a work force transfer.[18] Accordingly, we conclude that the Department's finding that a work force transfer occurred is supported by substantial evidence of record.

■ Next, People argues that the Department misconstrued the Affiliation Agreement when it found that People and Hobbie shared employer functions regarding the Staffing Employees.[19] According to People, essential provisions of the Agreement were over-looked, and when considered, they preclude the challenged finding. Specifically, People notes that the Agreement states that People is the sole employer of the Staffing Employees, Hobbie's authority over the Staffing Employees is limited to that of agent and Hobbie expressly agreed to relinquish its right of direction and control over the Staffing Employees and to act exclusively as People's agent in that regard. Accordingly, People maintains that Hobbie is not authorized under the Agreement to act as a co-employer. Relying on principles of agency law, People emphasizes that an agent can only act for its principal; it cannot act independently.

We find this argument unavailing. The contractual characterization of a parties' relationship may be binding on the parties to the contract, but it is not dispositive of the question of which entity is the employer under the Law. The statutory factors to be considered in determining employer status do not include the terms of the entities' contract, or their contractual allocation of responsibility. Moreover, before the addition of Section 4(j)(2.1) to the Law, this court looked beyond the terms of the

16. *See* Finding of Fact No. 19. Thus, contrary to People's suggestion, the Agreement was not completely silent regarding Hobbie's pre-existing work force.

17. In addition to the quoted testimony by Van Soest (*see* Opinion at 831), Van Soest also discussed the process whereby People acquired former Hobbie employees, stating, in pertinent part: "[June 27, 2005 is] the date upon which Hobbie became an active licensee and agent for People 2.0, and it is the date on which People 2.0 first began employing temporary personnel that were assigned to clients developed by the Hobbie Company...." R.R. at 97a.

18. Other evidence not cited by the Department also provides support for the conclusion that a work force transfer occurred. Of note, Van Soest testified that when a temp agency wins a competitor's client, "99% of the time, the temporary employees that have been going to or are on assignment with the end-user customer remain in that same assignment and begin working for the succeeding temporary help firm...." R.R. 120–21a.

19. In connection with this argument, People argues that the Department's findings of fact numbered 19–21 lack the requisite evidentiary support. This assertion is meritless; the challenged findings are essentially quoted sections of the Agreement.

parties' agreement to determine which entity was deemed to be the employer, focusing primarily on which entity was actually exercising direction and control over the subject employees. *See e.g., Cameron.* Notwithstanding the provisions highlighted by People, the Affiliation Agreement supports the finding that Hobbie is sharing employer functions with People. For instance, Hobbie screens applicants and hires employees, sets wages, directs employees and assigns them work on a daily basis, all responsibilities typically performed by an employer.[20] A contractual provision declaring that these duties are performed as an agent does not preclude a contrary conclusion when the factors set forth in Section 4(j)(2.1) are satisfied.

Next, People maintains that the record is devoid of any evidence that People was engaged in a PEO arrangement during the first quarter of 2010, when it was penalized for failing to file the quarterly report. Contending that it was the Department's burden to prove that the arrangement between People and Hobbie existed in 2010, People takes issue with the statement that: "At no point throughout the petition, testimony, or brief does [People] attempt to argue that no current relationship exists between [People and Hobbie]." Final Decision and Order at 9. While we might agree with this argument were we the fact-finder, we are limited to viewing the evidence in the light most favorable to the agency, which prevailed below, giving the agency the benefit of any inferences that can logically and reasonably be drawn from the evidence.

Initially, we note that a review of the Agreement reveals that it was originally entered into for a three-year term and could be renewed for another three-year term thereafter. If renewed, the Agreement would still have been in effect in 2010 if not terminated earlier by either party. While there was no testimony that the contract had been renewed, there was also no testimony that it had expired or was terminated. Moreover, when questioned about People's relationship with Hobbie, Van Soest testified in the present tense, never indicating that Hobbie was no longer a People affiliate; thus, Van Soest's testimony alone implied an on-going relationship simply because he never stated otherwise. Moreover, as the Department notes, in letters sent in January and February 2010, counsel for People responded to inquiries from OUCTS, providing it with documentation regarding its contractual relationship with Hobbie. At no point in these written responses does counsel indicate that the contractual relationship had ended. This evidence supports the logical inference that the People–Hobbie relationship continued in 2010.

People also argues that it is exempt from filing the report under Section 315(a)(4) of the Law as a matter of law because it operates exclusively as a temporary staffing company and Section 4(j)(2.1) expressly exempts temporary help arrangements from its application. According to People, Section 4(j)(2.1) was intended to apply "to companies ... where the very essence of the agreement is a transfer of an existing, primarily full-time, workforce from a customer to the PEO. The PEO then handles payroll, payroll taxes, unemployment taxes, workers[·] compensation insurance, benefits administration, and human resources as to that workforce...." Appellate brief at 47–48. According to People, it is not a PEO; rather it "sends temporary personnel em-

---

**20.** People does not dispute that Hobbie performs these responsibilities. Van Soest also recognized that Hobbie performed many of these functions, specifically testifying to Hobbie's authority to hire Staffing Employees in the local market.

ployed by People 2.0 to work at client locations, who in turn, pay People 2.0 for such temporary staffing services." *Id.* at 45.

People is correct that Section 4(j)(2.1) excludes a "temporary help arrangement in which an individual or entity utilizes one or more workers supplied by another individual or entity to supplement its work force in special, temporary work situations such as absences, skill shortages, seasonal workloads and special assignments." 43 P.S. § 753(j)(2.1). While the argument advanced by People has not been addressed before, we agree with the Department that People's focus is misplaced. This provision plainly applies to the relationships between the staffing agency (here, Hobbie and/or People) and its customers, who are using the company's temporary workers to supplement its own work force. In those cases, the assignment of a worker to supplement a client's work force on a temporary basis will not be considered a transfer of an employee to the payroll of another resulting in shared employer functions and corresponding separate reporting requirements under the Law; the customer of the temporary staffing agency will not be responsible for filing the Section 315(a)(4) report.

The exclusion does not apply, however, to the People–Hobbie relationship. While People and Hobbie are jointly engaged in a business model that provides temporary help services to third-party clients, the relationship between People and Hobbie is not a temporary help arrangement; People does not supply temporary workers to supplement Hobbie's work force (referred to as the Core Employees). *All Staffing, Inc. v. Commonwealth,* 10 A.3d 389 (Pa. Cmwlth.2010) (en banc), *affirmed,* 614 Pa. 505, 38 A.3d 796 (2012), cited by People, actually supports our conclusion. The issue in *All Staffing* was whether services provided by a PEO (described as the Administrative Employer) to its client (described as the Worksite Employer) constituted "help supply services" as defined in the Tax Code such that the PEO should have been collecting sales taxes on its service fees. As in this case, the Worksite Employer's employees were transferred to the payroll of the PEO and became the PEO's employees. The PEO performed human resource-related services and the Worksite Employer retained direction and control over the employees' day-to-day activities. The PEO did not have an inventory of employees to add to the Worksite Employer's workforce and any additions to that workforce came from sources other than the PEO. The Department audited the PEO's business activities and determined that it was providing taxable "help supply services" and assessed sales tax on its fees for those services. This court reversed on appeal, concluding that the PEO's services to the Worksite Employer did not constitute help supply services within the meaning of the Tax Code. In particular, we noted that the employees, who were on the PEO's payroll and supervised by the Worksite Employer, were not actually provided by the PEO to the Worksite Employer, a necessary requirement to constitute help supply services. We held: "Here, Taxpayer [the PEO] becomes the co-employer of pre-existing permanent workforces and then provides human resource services and benefits to both the worksite employers and the employees. The PEO services provided by Taxpayer do not include supplying new or additional labor to worksite employers." 10 A.3d at 392. Thus, we concluded the Department of Revenue erred in imposing a sales tax on the PEO's service fees.

For the same reasons, we reject People's contention that it cannot be both a help supply services company and a PEO as a matter of law, and that the Depart-

ment of Revenue's treatment of People as a help supply services company estops the Department from treating it as a PEO. People argues:

> The rule applicable to this case from the *All Staffing* decision is that there are certain characteristics that make a PEO different from help supply services. The primary difference is that a PEO does NOT maintain a roster of employees to supply to customers and is not in the business of supplementing the workforces of other business [sic]. The evidence is undisputed that all [People] does is provide employees to supplement the workforces of its customers. Thus, according to *All Staffing*, People 2.0 is [a] help supply services company, not a PEO. The Department of Revenue recognized this distinction by assessing People 2.0 as a help supply services company. . . .

Appellate brief at 50 (internal citations omitted). In response, the Department contends that: "If [People] meets the requirements of being in a [professional employer arrangement] with Hobbie under the UC Law, there is nothing to indicate that that conclusion is altered because [People] provides help supply services to clients within the meaning of the Fiscal Code." Appellate brief at 42. We agree with the Department's position. As noted above, People and Hobbie are jointly engaged in the business of providing temporary help supply services to third party clients, a business subject to sales tax under the Tax Code. However, to the extent that the employees who provide temporary services to the clients of Hobbie and People have been permanently transferred

from the payroll of Hobbie to that of People, People is also acting as a functional PEO under the Unemployment Compensation Law.

■ We acknowledge that the People–Hobbie relationship does not fit the typical professional employer arrangement or PEO described in *All Staffing*, but Section 4(j)(2.1) applies to any work force transfer meeting the criteria set forth therein. Section 4(j)(2.1) was enacted in connection with other provisions to preclude intentional (or even coincidental) tax rate avoidance and ensure the proper assessment of tax based upon actual unemployment experience; it serves to ensure that the proper rate is assessed by designating the entity deemed to be the employer *under the Law* in qualifying co-employment arrangements. Accordingly, Section 4(j)(2.1) focuses only on the relationship between the two entities and their employees; the actual business engaged in by the entities, and the tax consequences of that business under the Tax Code, are neither dispositive of nor relevant to the determination of employer status. Thus, the Department of Revenue's determination that People's business constitutes a help supply services company requiring the collection and remittance of sales tax on its customer invoices [21] does not impact or preclude the Department's conclusion here that a Section 4(j)(2.1) transfer occurred when Hobbie joined forces with People. More specifically, the Department of Revenue's determination that tax must be collected and reported on the revenue generated by the provision of temporary help services simply has no bearing on the determina-

---

**21.** This fact was established only by Van Soest's testimony. The documentation from the Department of Revenue, admitted into evidence, demonstrates only that the Department of Revenue audited People and determined that additional taxes were due. The Department does not dispute, however, that the Department of Revenue considers People a help supply services company. Moreover, this is logical in light of the temporary staffing services that it provides.

tion of experience rating or the tax rate associated with the employment of the Staffing Employees. People and Hobbie have chosen a business model/relationship that falls squarely within the confines of Section 4(j)(2.1). As a result, Hobbie remains the employer for reporting and assessment purposes, and People must file the Section 315(a)(4) report. Contractually deeming Hobbie an agent cannot avoid these statutorily designated roles and obligations.

■ Finally, People argues that its failure to file the subject report was not willful, rendering the assessment improper. Although People acknowledges that "following the Department's November 9, 2009 correspondence it was aware of the allegation that it was a PEO under Section [4(j)(2.1) ]," Appellate brief at 58, it contends that its classification as a help services supply company by the Department of Revenue precludes a finding that it acted willfully. We disagree.

For purposes of assessing a penalty, Section 802.1 directs that the term "wilfully" shall be construed consistently with "willfully" as that term is used in Section 302 of the Crimes Code, 18 Pa.C.S. § 302 (relating to general requirements of culpability). Pursuant to Section 302(g), a person acts willfully if the person acts "knowingly." 18 Pa.C.S. § 302(g). Section 302(b)(2) of the Crimes Code, 18 Pa.C.S. § 302(b)(2), further provides that:

A person acts knowingly with respect to a material element of an offense when:

(i) if the element involves the nature of his conduct or the attendant circumstances, he is aware that his conduct is of that nature or that such circumstances exist; and

(ii) if the element involves a result of his conduct, he is aware that it is practically certain that his conduct will cause such a result.

The Department argues that the record supports the conclusion that People knew that it was required to file a PEO report for the first quarter of 2010. Specifically, every employer was advised of the change in law in 2005 and advised of the PEO filing requirements. The Department further points to the Affiliation Agreement as evidence of People's knowledge that its employment structure might be subject to administrative inquiry or dispute. Specifically, the Agreement provided that: (1) Hobbie has a right to terminate the Agreement if either People or Hobbie receives a notice of assessment of UC taxes due or a notice of audit regarding UC taxes during the period of the Agreement [Agreement, art. 12(b) ]; (2) People agrees to indemnify Hobbie against, *inter alia*, state agency claims relating to unemployment compensation that challenge, fine or disallow the employment structure under the Agreement [*id.*, art. 13.3]; and (3) Hobbie agreed to cooperate in drafting a letter to the Department explaining the Agreement, the relationship of the parties and Hobbie's decrease in payroll in the second quarter of 2005 and thereafter [*id.*, art. 3.14]. Accordingly, the Department argues that there is sufficient evidence of record that it had a duty to file a report in the first quarter of 2010.

People and Hobbie have crafted a business arrangement that essentially allows People to continue business in Hobbie's name, in Hobbie's local market, with a number of Hobbie's former employees, under the daily direction and control of Hobbie. The record does not establish whether such arrangement was crafted with the intent of achieving a lower unemployment rate. The terms of the Agreement make clear, however, that People anticipated that the arrangement might be subject to administrative examination and review, which it was, and People was notified in

November 2009 that the Department's review led to the conclusion that People was deemed to be a PEO, the wages paid to the employees had been reported under the incorrect account and that it was required to register as a PEO and file the requisite quarterly report. In light of this written notice, the Department's determination that People's failure to file the quarterly report was willful, and subject to a penalty, is amply supported.

Based on the foregoing, the order is affirmed.

Judge BROBSON did not participate in the decision in this opinion.

## ORDER

AND NOW, this 20th day of November, 2014, the order of the Department of Labor and Industry is hereby AFFIRMED.